Filed 11/26/14  P. v. Mejorado CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C073485 |
| Plaintiff and Respondent, | (Super. Ct. No. SF111696A) |
| v. | |
| ANTHONY SANTOS MEJORADO, | |
| Defendant and Appellant. | |

A jury found defendant Anthony Santos Mejorado guilty of second degree murder as a lesser included offense of the charged crime, and assault with force likely to produce great bodily injury; it also sustained an allegation of personal infliction of great bodily injury on the assault victim.  (The information had alleged both of these offenses were "serious" felonies (Pen. Code, §§ 1192.7 & 667, subd. (d)).)[1]  The jury acquitted him of dissuading a witness.  The trial court subsequently found defendant had (1) a prior

_____

[1] Undesignated statutory references are to the Penal Code.

juvenile adjudication and a prior conviction involving serious felonies, which qualified him for indeterminate life terms for his present offenses (§ 667, subd. (e)); (2) enhancements for a prior conviction (*id*., subd. (a)); and (3) a prior prison term (§ 667.5) based on the prior criminal conviction, the latter of which it stayed (§ 654). It thus sentenced him to state prison for an indeterminate life term of at least 70 years, consecutive to an eight-year determinate term.

On appeal, defendant argues the trial court erred in admitting evidence about the activities of a criminal street gang and his membership in the gang; there is insufficient evidence to support the finding that he inflicted great bodily injury, so we must strike the enhancement; the evidence is also not sufficient to show that either his prior conviction for a gang-related offense or juvenile adjudication for assault involved serious felonies; and evidence otherwise is absent of a criterion (§ 667, subd. (d)(3)(D)) for using a prior juvenile adjudication to qualify the present offenses for sentencing pursuant to section 667, subdivision (e). The People concede the arguments regarding the prior conviction and juvenile adjudication, and ask that we remand for retrial on these recidivist allegations. We shall affirm the convictions for murder and assault (and the enhancement for great bodily injury infliction). We will vacate the recidivist findings (other than the stayed sentence for the prior prison term). We will remand for retrial on whether the prior gang-related conviction and prior juvenile adjudication involved serious felonies (§§ 667, subd. (d), 1192.7) and resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties both provide lengthy statements of facts. The resolution of the issues on appeal does not require us to relate them all.

### A. *The Murder*

The murder victim was entertaining a number of people at his home. Among his guests were defendant's cousin (a codefendant who pleaded guilty before trial in

exchange for his testimony), a neighbor, and the neighbor's girlfriend. The neighbor was close with both defendant's cousin (a friend since the fourth grade) and the murder victim's sons. The cousin, who had not been there before, believed the home was a site encouraging drug use (based on his observations). The cousin knew many of the people there well.

The neighbor was irked with his girlfriend and defendant's cousin because of a recent amorous incident between them; he had told them to stay away from each other. When the neighbor arrived at the gathering and saw them sitting together, the neighbor got into a fight with defendant's cousin, which continued outdoors. The neighbor's mother and brother came outside and broke up the fight.

While the neighbor's mother was berating her son and his girlfriend (the latter of whom the mother blamed for being the source of the ill-will between the two longtime friends), she saw defendant arrive with his girlfriend, driving the girlfriend's car. There had been a phone call to defendant's girlfriend informing her about the fight, which defendant overheard. He wanted to stop at the murder victim's home to see if his cousin was okay. The cousin walked up to defendant after the latter got out of the car. The neighbor's mother joined them in order to talk to defendant's cousin about what had happened between him and her son. Defendant made disparaging racial remarks about the neighbor's family (which also applied to most of the guests), and told his cousin that members of their gang should not be associating with the neighbor's family. Defendant directed his cousin to get into the car, and they drove off.

Several hours later, defendant returned to the murder victim's home with his girlfriend and his cousin, because the cousin had planned on staying the night there. Defendant wanted to go inside with his cousin to make sure no one was planning on fighting with him. One of the remaining guests was another relative of the neighbor, who also knew defendant's cousin. The cousin showed him a handgun in his waistband,

3

which he said he was hiding from defendant. (Defendant's cousin testified that defendant had given the gun to him on their way there.)

Defendant told his girlfriend to go wait in the car. Defendant and his cousin went into the bedroom, where the murder victim was playing on his drum set. Defendant then began to yell at the murder victim about the color of his shirt, demanding that he remove it. Defendant also asked the murder victim to identify his origin (the cousin claimed this was not necessarily a gang-related inquiry).[2] The murder victim, who was apparently a Mexican national who spoke little English, was bewildered by this confrontation. Defendant punched the murder victim twice, knocking him off his stool. As he lay on the floor, the murder victim kept shouting "no mas," and pulled off his shirt. The cousin tried to pull defendant away, but defendant shook him off and hit the murder victim in the head with the stool. The cousin fled the bedroom.

One of the remaining guests (Loren Pruitt) heard the commotion from the kitchen. It sounded like someone was knocking over the drum set, and he went to the door of the bedroom. Defendant was holding one of the large drums over his head as he stood over the murder victim. The neighbor's relative grabbed the back of Pruitt's shirt and told him to come away from the door.

A stepbrother of the neighbor, who was also present in the living room, told police that he saw defendant challenge the murder victim about the color of his shirt; defendant forced the murder victim into the bedroom, where the stepbrother could see defendant attack him. In the course of the beating, defendant poked at the murder victim's eye with

---

[2] Defendant's cousin admitted he associated with members of the gang to which defendant had belonged "before he went to the pen." A police gang expert testified that the cousin was a documented member of the gang from which defendant claimed to have dropped out (a claim the officer did not credit).

4

a drumstick. The police witness testifying about his interview with the stepbrother admitted that one could not see directly into the bedroom from the living room.

After a short interval, defendant came back into the living room. He told his cousin that they were leaving, and directed him to take a bag of pain medications from Pruitt. Pointing the gun at Pruitt's head, the cousin took the bag. Defendant warned Pruitt, "You didn't see anything."

Defendant's girlfriend had been waiting about four minutes when defendant and his cousin returned to the car. Defendant told her that he had been in a fight, and they were taking the cousin home. The girlfriend did not notice any blood on defendant. Defendant asked his girlfriend if she had been staring at any of the men in the house (again using a racial epithet).

The responding officer described finding the murder victim lying on the floor of the bedroom. He had major trauma to the head; blood covered his face, and his left eye was protruding from its socket. His breathing was labored. The drum set was broken, and blood spatter was all over the room. The murder victim died a few days later from his extensive traumatic brain injuries. The pathologist noted that a small, firm object consistent with a drumstick had been used to stab the eye multiple times, penetrating into the brain.

During his initial police interview, defendant denied ever returning to the murder victim's house. In a subsequent interview, police told him his cousin had said defendant was in a fight with the murder victim, "kick[ing] his ass" because of the color of his shirt. Defendant responded, "That's a truth. I plead guilty to that."

The police gang expert testified that he believed defendant (and his cousin) were members of a particularly violent subset of a larger gang. The expert also testified about the activities of the umbrella organization and the symbols of affiliation it employed. He

5

believed the motive for the fatal beating grew out of this gang culture, which caused defendant to react with extreme violence to the color of the victim's shirt whether or not he went back to the home in order to defend his cousin's honor, given that the murder victim did not have anything to do with the earlier fight.

## B. *The Assault*

After the ultimately fatal beating of the murder victim, defendant drove the group to the home of the cousin's grandmother (where the cousin intended to spend the night), picking up his cousin's girlfriend on the way. Finding out that the grandmother did not have any room for him, they started to take the cousin elsewhere and drive the cousin's girlfriend home. However, defendant drove over a curb or train tracks, and the passenger side tires both blew out. They returned to the grandmother's house to change the tires.

Defendant borrowed a tire iron from the assault victim, who was a neighbor. They became frustrated about their inability to remove the wheels. The assault victim offered them advice, noting there were locks on the wheels. Defendant and his cousin both took umbrage at the assault victim's know-it-all attitude. Defendant took the tire iron and began to strike the assault victim in the face. They both fell to the ground. The assault victim initially got atop defendant in an attempt to restrain him, but with his cousin's assistance defendant got the upper hand; he got astride the assault victim and began punching him in the face until his girlfriend, his cousin, and the grandmother made him stop. The assault victim staggered back to his trailer and the group got back into the disabled car and drove off.

Officers responding to a call for assistance from witnesses tried to contact the assault victim, who would not answer his door. Through the window, the officers could see him lying with a blood-soaked pillow over his face. He declined assistance, but fire department personnel forced their way inside. The assault victim had a number of cuts around his face that were bleeding extensively. The officer testified it was hard to tell the

6

exact nature of his injuries because there was so much swelling and trauma. The officer authenticated three pictures of the assault victim's injuries.

## *C. Defense*

The defense rested without presenting any evidence. Defense counsel asserted in his closing argument that "this is a case of a sweetheart deal with a guilty man to try to wrongfully convict a not guilty man," discussing at painful length the cousin's weak credibility and counsel's contention that "all the evidence" pointed to the cousin's guilt in the absence of any DNA or fingerprint evidence connecting defendant with the murder victim. Defense counsel did not address in any detail the evidence involving the assault. Defense counsel also asserted the introduction of gang evidence as motive for the crimes was a red herring that was simply intended to turn the jury against defendant. (We note the prosecutor specifically argued the evidence was limited to explaining the motive for this otherwise random-seeming incident of extreme violence, and he was not suggesting the gang membership proved defendant committed any crime.)

## DISCUSSION

## I. Admission of Gang Evidence

Pointing out that the trial court had dismissed all gang offenses and enhancements before trial, defendant argues the court erred in allowing the police expert to testify about the nature of the gang, his belief that defendant was an active member, and his belief that the motive for the murder was based in gang culture. Stressing the highly inflammatory nature of gang evidence, defendant contends the error was prejudicial and requires the reversal of the murder conviction. Defendant fails to identify any point at which he objected to the expert's actual testimony on these bases.

We do not need to belabor whether the trial court erred in allowing admission of the gang evidence in general or in failing to limit the scope of the expert's testimony (in connection with which defendant adds a peripheral challenge to the offer of an opinion

7

about the motive of defendant rather than a hypothetical gang member),[3] or whether defendant has forfeited the issue. The jury convicted defendant *only* of the lesser offense of second degree murder, and also acquitted him of a charge of dissuading a witness. Beyond an effort to deflect guilt to his cousin, essentially requiring the jury to discredit all the eyewitnesses, defendant did not counter the evidence of his commission of the offenses. Under these circumstances, we cannot find any indication that the jury decided the case based on an emotional bias against defendant unrelated to the evidence and issues. (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) Nor can we find any prejudice from the phrasing of the expert opinion on motive (which is not an element), given the extreme nature of the injuries supporting an intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 740-742.) Defendant thus fails to establish prejudice from this evidence, and his argument fails.

## II. Sufficient Evidence of Infliction of Great Bodily Injury

Assault with force *likely* to result in great bodily injury is considered a serious felony within the meaning of section 1192.7 only where a jury sustains an allegation that the defendant *inflicted* great bodily injury on a nonaccomplice (§§ 1192.7, subd. (c)(8), 12022.7).[4] Absent that finding, the conviction cannot be a qualifying offense for the imposition of an indeterminate life sentence. (§ 667, subds. (d) & (e).)

---

[3] We have described arguments that have only a tangential connection with their headings as "lurking" and not subject to our plenary consideration. (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593, fn. 10; *Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 202.)

[4] In a straw argument, defendant asserts the evidence is insufficient to establish that the assault was a serious felony on the basis of its commission with a deadly weapon. (§ 1192.7, subd. (c)(31).) While charged in the alternative, the trial court instructed only on force, not use of a deadly weapon. We thus disregard this argument, which otherwise ignores defendant's use of a tire iron.

Despite the testimony included above of the responding officer's description of the assault victim's injuries and the photographs of those injuries (which defendant did not include in the record on appeal), defendant contends the evidence is insufficient to establish the infliction of great bodily injury because the victim did not testify and the prosecutor did not include medical records or testimony from anyone who treated the victim for his injuries (a point defense counsel raised in closing argument). Although he concedes that evidence of a victim's medical treatment is not essential to proof of great bodily injury (*People v. Wade* (2012) 204 Cal.App.4th 1142, 1150), he notes that evidence of the resulting pain and medical care is "commonly" used (*People v. Cross* (2008) 45 Cal.4th 58, 66), and the evidence in the present record is otherwise insufficient on its own. He then cites a number of other cases that include such other evidence— which we do not need to relate because they do not establish any principle of law and simply reflect their own facts on a case-specific issue (*People v. Rundle* (2008) 43 Cal.4th 76, 137-138 [sufficiency of evidence]; cf. *People v. Ault* (2004) 33 Cal.4th 1250, 1267 [assessing prejudice])—before asserting, as if it were a matter of which we may take judicial notice, that facial and head injuries often swell and bleed heavily even from minor injuries because of the profusion of blood vessels close to the surface of the skin.[5]

---

[5] In another lurking argument, defendant additionally contends the trial court erred in "editorializing" on the pertinent instruction when it stated that broken bones or stitches are not necessary to prove great bodily injury, because the definition in felony battery of "*serious* bodily injury" (§ 243, subds. (d) & (f)(4), italics added), which is "essentially" identical to "great bodily injury" (*People v. Moore* (1992) 10 Cal.App.4th 1868, 1871), includes both broken bones and stitches. That the definitions are *essentially* equivalent does not elide the fact that they *are* distinct, with serious bodily injury including specific qualifying injuries that might otherwise not satisfy the definition of great bodily injury if they are moderate in nature. (*People v. Taylor* (2004) 118 Cal.App.4th 11, 24 [fracture can be serious bodily injury even if too moderate to constitute great bodily injury], cited with approval in *People v. Santana* (2013) 56 Cal.4th 999, 1008-1009.) Consequently, the trial court's remark in instructing the jury was proper.

Because defendant failed to include the photographs of the injuries to the assault victim in the record on appeal, we would be warranted in presuming that they provided substantial evidence in support of the enhancement. (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186-187 [appellant may not challenge sufficiency of evidence with only selected excerpts from clerk's transcript without reporter's transcript or exhibits]; cf. *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324 [absent reporter's transcript, must presume on appeal that evidence was sufficient to support judgment].) It thus suffices to say that we have transferred the pertinent exhibits (People's exhs. 29 to 31) to this court, and conclude the testimony and these photographs more than adequately establish that the injuries were significant or substantial. As a result, we reject defendant's argument.

### III.  The Gang-related Prior Conviction

The prosecution submitted documentary evidence as proof that defendant's 2006 conviction was a serious felony within the meaning of section 1192.7. As is pertinent, the custodian of defendant's prison records provided the abstract of judgment, which showed only that in March 2006, defendant entered a plea in San Joaquin County Superior Court case No. MF029221B to a violation of "criminal street gang" pursuant to section 186.22, subdivision (d) and received a one-year prison term. Apparently, defendant waived a probation report.[6]

---

[6]  There is also a fingerprint card included, on the back of which appears the notation "186.22(D) PC (F)."  Whether or not this is a description of the offense as a felony, such notations on fingerprint cards are not reliable evidence of the nature of a conviction in the absence of any evidence of its contemporaneous preparation with the judgment and a duty to make accurate entries. (*People v. Miles* (2008) 43 Cal.4th 1074, 1093-1094 (*Miles*), citing with approval *People v. Jones* (1999) 75 Cal.App.4th 616, 633-634; cf. *People v. Ruiz* (1999) 69 Cal.App.4th 1085, 1090-1091 (*Ruiz*) [may use notation of enhancement on fingerprint card to interpret partially illegible abstract].)

10

Section 186.22, subdivision (d) is not a substantive offense; it is an alternative sentencing scheme under which a felony *or misdemeanor* committed to benefit a gang or in association with a gang is punishable either with a jail term or a state prison sentence of one, two, or three years.  This means a misdemeanor can be *punished as* a felony, but is not a serious felony within the meaning of section 1192.7, subdivision (c)(28).  (*People v. Ulloa* (2009) 175 Cal.App.4th 405, 410-413 (*Ulloa*).)  As a result, where a prosecutor submits evidence that does not indicate the nature of the *underlying offense* punished pursuant to this statute, it is insufficient to demonstrate that it is a serious felony because we must presume it was the least offense punishable.  (*Id*. at p. 413.)

Defendant argues his 2006 conviction on the present evidence cannot be used either to enhance his sentence (§ 667, subd. (a))[7] or to qualify his present offenses for sentencing pursuant to subdivision (e) of the statute.  In light of *Ulloa*, the People are correct to concede the argument, and ask that we remand for retrial to present additional evidence, which is permissible.  (*Ulloa*, *supra*, 175 Cal.App.4th at p. 413.)  We accept their concession and will grant their requested remedy.[8]

## IV.  The Juvenile Adjudication

In proof of the nature of defendant's 2004 juvenile adjudication, the prosecutor submitted two exhibits.  These included the May 2004 original petition in San Joaquin

---

[7]  He makes another straw argument that his juvenile adjudication cannot be a basis for the enhancement.  It was neither alleged nor found to be the basis for the enhancement, so we ignore this argument.

[8]  It would appear (from testimony of the gang expert at trial) that the underlying offense was in fact assault with a deadly weapon upon another Division of Juvenile Justice (DJJ) inmate in November 2005, although this testimony cannot establish this fact for purposes of section 1192.7.  (*People v. Reed* (1996) 13 Cal.4th 217, 226 [prosecution cannot use testimony of live witnesses to establish nature of prior conviction].)  Thus, the remand is not an idle act.

11

County Juvenile Court case No. 61249, which alleged a violation of section 245, subdivision (a)(1) *by means of a knife*; defendant's July 2004 admission of the allegations that he violated "245(a)(1) PC" in an *amended* July 2004 petition (which was not part of the exhibit), in exchange for dismissal of enhancements not included in the original petition; a September 2004 dispositional order (apparently granting probation) simply referring to the offense as "245(a)(1)"; and a dispositional order in March 2005 committing defendant to the custody of the DJJ (after the juvenile court had sustained an aggregating petition in December 2004) that does the same.

On this basis defendant argues there is insufficient evidence to establish that the offense *necessarily* involved a deadly weapon, in order to come within the definition of a serious felony in section 1192.7, subdivision (c)(31). (*People v. Delgado* (2008) 43 Cal.4th 1059, 1065-1066 (*Delgado*).) The People concede the error, and request that we remand for retrial on the finding.

For similar reasons, defendant alternately argues the evidence is also insufficient to prove that in the proceeding resulting in his adjudication, he necessarily committed an offense listed in Welfare and Institutions Code section 707, subdivision (b), because only assault by means of force likely to inflict great bodily injury is included in that statute, not assault with a deadly weapon other than a firearm or destructive device. (Welf. & Inst. Code, § 707, subd. (b)(13) & (14).) He thus contends the adjudication cannot be used to qualify him for sentencing pursuant to Penal Code section 667, subdivision (e). (*People v. Garcia* (1999) 21 Cal.4th 1, 13, interpreting § 667, subd. (d)(3)(D).) The People concede the error and request that we remand the matter for retrial.

Neither party gave heed to the last page of People's exhibit 59 (an exhibit the DJJ prepared for the prosecutor of records concerning defendant's custody in its facilities), which is a certified printout of defendant's referral history. This describes the 2004

12

offense as assault with a deadly weapon.  We solicited supplementary briefing on the effect of this document.

Ultimately we do not need to resolve whether this record is either the product of an official whose duties require sufficient accuracy in the contemporaneous recording of a judgment to come within the standards of *Delgado*, *supra*, 43 Cal.4th at pp. 1066, 1070-1071 for the presumption of the regular performance of official duties (there, an abstract of judgment), or whether it is a collateral document lacking reliability (*id*. at p. 1072 [FBI document of uncertain provenance and purpose]; *Miles*, *supra*, 43 Cal.4th at pp. 1093-1094 [FBI fingerprint card].)[9]  We also do not need to decide whether *Ruiz*, which apparently would allow use of the referral history to interpret the juvenile records, was disapproved by implication in *Miles* and *Delgado*.  We must remand in any event for retrial of the recidivist allegations premised on the gang-related conviction, so any resolution of what has already been proven about the nature of the adjudication will not expedite matters on remand.  If in fact the adjudication was for assault with a knife, the People will be unable to establish that it is a qualifying adjudication (§ 667, subd. (d)(3)(D)) even though this will prove it *does* involve a serious felony offense (§ 1192.7, subd. (c)(31)).

### DISPOSITION

Defendant's convictions are affirmed, as is the injury enhancement.  The enhancement for a prior serious felony conviction (§ 667, subd. (a)) is vacated and remanded for retrial.  The findings that the prior gang-related conviction and prior juvenile adjudication involve serious felonies (§§ 667, subd. (d); 1192.7) are also vacated

---

[9]  The People's thorough analysis in their supplementary briefing concludes the referral history is akin to the FBI fingerprint card in *Miles*, and therefore they do not assert we should rely on it.

13

and remanded for retrial.  Upon completion of the retrials of the recidivist allegations on remand, the trial court shall resentence defendant.


                                        BUTZ                    , J.



We concur:



          ROBIE                    , Acting P. J.



          MURRAY                  , J.



14